**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**CENTRAL DIVISION**

MISSOURI COALITION FOR THE
ENVIRONMENT FOUNDATION,

                 Plaintiff,

v.

ANDREW R. WHEELER, in his official
capacity as the Administrator
of the United States Environmental
Protection Agency,

                 Defendant.

Case No. 2:19-cv-4215-NKL

**ORDER**

Before the Court are motions to intervene filed by the State of Missouri, Doc. 17, and by

the Association of Missouri Cleanwater Agencies, the Association of Ohio Metropolitan

Wastewater Agencies, the California Association of Sanitation Agencies, the National

Association of Clean Water Agencies, the North Carolina Water Quality Association, the South

Carolina Water Quality Association, the Virginia Association of Municipal Wastewater

Agencies, and the West Virginia Municipal Water Quality Association ("the Associations"),

Doc. 20.  For the reasons stated below, the State of Missouri's motion is granted, and the

Associations' motion is denied.

## I.    BACKGROUND

Under the Clean Water Act, 33 U.S.C. § 1251 et seq., states must develop water quality

standards for all navigable bodies of water within their jurisdiction.  *See* 33 U.S.C. § 1313(a).

Section 303(c)(3) of the Act requires states to review these water quality standards at least once

every three years, through a process known as a "triennial review," and submit the results of this

1

review to the United States Environmental Protection Agency. 33 U.S.C. § 1313(c)(1). If a state revises or adopts a new standard, these standards must be submitted to the EPA for approval. 33 U.S.C. § 1313(c)(2)(A). Revised or new state water quality standards must "consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses." *Id*.

Once submitted, the EPA must evaluate new or revised state standards to ensure compliance with the CWA. 33 U.S.C. §§ 1313(c)(2)(A), (c)(3). If the EPA disapproves the standards, it must notify the state within 90 days and specify changes for the state to make. 33 U.S.C. § 1313(c)(3). The state then has an additional 90 days to revise its standards. *Id*. If it fails to do so, the EPA "shall promptly prepare and publish proposed regulations setting forth a revised or new water quality standard for the navigable waters involved." 33 U.S.C. § 1313(c)(4). The EPA must then promulgate any revised or new standard within 90 days of publication, unless within that period the state "has adopted a revised or new water quality standard which the Administrator determines to be in accordance with this chapter." *Id*.

In November 2009, Missouri submitted the results of its triennial review to the EPA including nutrient and chlorophyll water quality criteria, but in 2011 the EPA disapproved of Missouri's standards for some of its lakes as the standards were not based on sound science and the state had not shown the approach would protect designated aquatic and recreational uses. Missouri did not revise its nutrient criteria in the 90 days thereafter, and the EPA did not promulgate its own. In February 2016, MCE brought suit in this Court seeking to compel the EPA to perform its duty under the CWA to promulgate revised or new lake numeric nutrient and chlorophyll water quality criteria for Missouri. After the Court denied the Association of Missouri Cleanwater Agencies' motion to intervene, *Missouri Coal. for the Env't Found. v.*

2

*Mccarthy*, No. 2:16-CV-04069-NKL, 2016 WL 3566253, at *1 (W.D. Mo. June 27, 2016), MCE and the EPA settled and the Court entered their consent decree, *Missouri Coal. for the Env't Found. v. McCarthy*, No. 2:16-CV-04069-NKL, 2016 WL 9047164, at *2 (W.D. Mo. Dec. 7, 2016). In the consent decree, the EPA agreed to sign a notice of proposed rulemaking addressing its 2011 disapproval of Missouri's numeric nutrient criteria for lakes and subsequently sign a notice of final rulemaking by certain dates, unless before either of those dates Missouri submitted revised water quality standards that addressed the EPA's disapproval and the EPA approved of those revised standards. In April 2018, Missouri submitted its water quality standards for the EPA's review, and on December 14, 2018, the EPA approved these standards.

Relevant here, Missouri's approved water quality standards include criteria for measuring the amount of nutrients in the water, including nitrogen and phosphorus, which can lead to degradation of water quality when they reach excessive levels. Missouri's standards also include criteria for chlorophyll-a, which is a response variable that can be used to determine whether waters are degraded due to high nitrogen and phosphorus concentrations. Missouri developed a "combined criteria" approach to set an allowable concentration of nutrients in its lakes, with criteria for three ecoregions in the state—the Plains, the Ozark Border, and the Ozark Highlands. Each ecoregion is assigned a total nitrogen (TN), a total phosphorus (TP), and a chlorophyll-a "screening threshold." A lake with values of TN, TP, or chlorophyll-a that are below the screening threshold is considered not impaired. When a lake's level of TN, TP, or chlorophyll-a exceeds the screening threshold, the water quality standards require further inquiry to determine whether one of five biological assessment endpoints are also present in the lake. If a TN, TP, or chlorophyll-a screening threshold is exceeded in the same year that a biological assessment endpoint is present, the water is classified as impaired. Each ecoregion is also assigned a

"response impairment threshold."  If a response impairment threshold is exceeded, the lake is considered impaired.  Missouri's water quality standards include a response impairment threshold for chlorophyll-a, but they do not include a response impairment threshold for TN or TP.  Under the CWA, designating a waterbody as "impaired" triggers the state's duty to design and implement additional protective measures in order to bring the waterbody into compliance with the water quality standards.

Plaintiff in this case is the Missouri Coalition for the Environment (MCE), a non-profit corporation with state-wide membership that "works to protect and enhance a broad range of environmental values through education, public engagement, and legal action."  *Id.* at ¶¶ 12–13.

MCE brings suit against Andrew Wheeler in his official capacity as Administrator of the EPA, asking "the Court to declare Defendant's approval of Missouri's nutrients standards arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law, and to order Defendant to disapprove of Missouri's nutrients standards submission and notify Missouri of the changes required to comply with the CWA."  Doc. 1, ¶ 9.  According to the Complaint, the basis for MCE's claim is that the EPA "arbitrarily and capriciously approved the Missouri standards after EPA had previously informed Missouri that the evidence before it indicated that numeric criteria for nutrients were necessary. Although EPA discussed no new evidence indicating that numeric criteria for nutrients were not necessary and viable, EPA accepted Missouri's contention that MDNR could not produce numeric nutrients criteria at this time."[1]  *Id.* at ¶ 7.  Further, the EPA "took Missouri at its word that the standards it developed to protect the fishable use would also suffice to protect the swimmable and drinking water uses."  *Id.*  Finally,

---

[1] By "numeric criteria," MCE is referring to an upper TN and TP threshold.  If a waterbody contained values of TN or TP above such upper threshold, it would be considered impaired, similar to Missouri's "response impairment threshold" for chlorophyll-a.

in approving the biological assessment endpoints, EPA relied on an internal Missouri Department of Natural Resources ("MDNR") document that MDNR submitted to EPA months after it had submitted the finalized standards for EPA approval, meaning it had not been made available to the public during Missouri's administrative process. *Id*. at ¶ 8.

The first proposed intervenor is the State of Missouri, seeking to defend its work in creating the regulations and its interest in enforcement of the current regulations. The second proposed intervenor is a group of eight wastewater associations—the Association of Missouri Cleanwater Agencies, the Association of Ohio Metropolitan Wastewater Agencies, the California Association of Sanitation Agencies, the National Association of Clean Water Agencies, the North Carolina Water Quality Association, the South Carolina Water Quality Association, the Virginia Association of Municipal Wastewater Agencies, and the West Virginia Municipal Water Quality Association (collectively, "the Associations"). The Associations' members include local government entities that are owners of public water, sewer, and stormwater treatment utilities in almost all fifty states, the District of Columbia, and Puerto Rico, that discharge nutrient-containing wastewater. *See* Doc. 20-2, Ex. 1 (Intervenor Membership List). The Association of Missouri Cleanwater Agencies' members include twenty Missouri publicly-owned wastewater treatment plants ("POTWs"). The Associations assert that most of these members hold permits to discharge wastewater and/or stormwater in Missouri and therefore are or will be subject to Missouri's state nutrient standards in future permitting processes. Eleven of the 331 National Association of Clean Water Agencies members are located in Missouri; the remaining 320 National Association of Clean Water Agencies' members are located in other jurisdictions. The six other intervenors' members are located in Ohio, California, North Carolina, South Carolina, Virginia, and West Virginia.

## II.    STANDARD

Both the State of Missouri and the Associations argue they should be permitted to participate either (1) by intervening as of right or (2), in the alternative, through permissive intervention. *See* Fed. R. Civ. P. 24.

In order to intervene as of right under Federal Rule of Civil Procedure 24(a), a party must show that "it claims an interest in the property or transaction which is the subject of the litigation, that disposition of the litigation in the party's absence may impede or impair its ability to protect its interest, and that the interest is not adequately represented by the current parties to the suit." *S. Dakota v. Ubbelohde*, 330 F.3d 1014, 1023 (8th Cir. 2003) (citing Fed. R. Civ. P. 24(a)(2)). In addition, the party seeking to intervene "must also have Article III standing." *Mausolf v. Babbitt*, 85 F.3d 1295, 1300 (8th Cir. 1996). "Constitutional standing requires a showing of: (1) an injury in fact, which is an invasion of a legally protected interest that is concrete, particularized, and either actual or imminent; (2) causation; and (3) redressability." *Curry v. Regents of Univ. of Minnesota*, 167 F.3d 420, 422 (8th Cir. 1999). Under this inquiry, an injury is imminent where it "is not too speculative" and "is certainly impending." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 n. 2 (1992). The risk of imminent, direct financial harm constitutes an injury for these purposes. *See Eckles v. City of Corydon*, 341 F.3d 762, 768 (8th Cir. 2003). When assessing a motion to intervene, a court assumes the plaintiff will prevail on its claim and secure the remedy it seeks. *National Parks Conservation Ass'n v. U.S. E.P.A.*, 759 F.3d 969, 973 (8th Cir. 2014).

## III. DISCUSSION

### a. State of Missouri's Motion to Intervene

The State of Missouri seeks to intervene pursuant to both Federal Rule of Civil Procedure 24(a) as of right and Rule 24(b) by permission. Neither MCE nor EPA opposes Missouri's intervention.

The Court finds that the State of Missouri is entitled to intervention as of right. The motion was timely, as it was filed within weeks after litigation began. Further, Missouri has Article III standing here, because the water quality standards being reviewed were drafted and proposed by the Missouri Department of Natural Resources. Setting aside the EPA's approval of these regulations would cause Missouri to incur costs in drafting and proposing new standards that would be fairly traceable to the Court's decision. Likewise, Missouri has a clear, protectable interest in defending the regulations that it drafted, proposed, and is responsible for implementing and enforcing, and this interest would be impeded should it be prevented from intervening here to defend the preservation of those regulations. *See Guardians v. U.S. Bureau of Land Mgmt.*, No. CV 12-0708 (ABJ), 2012 WL 12870488, at *1 (D.D.C. June 7, 2012) (finding the State of Wyoming had an interest that would be impeded by a challenge to a federal agency action because it had participated in the original decision, had "invested considerable time and resources participating in the development of the current federal environmental impact statement . . . [a]nd the state would be involved if, ultimately, a new statement is required."); *Nw. Envtl. Def. Ctr. v. United States Envtl. Prot. Agency*, No. 07-CV-1396-BR, 2007 WL 9809079, at *1 (D. Or. Oct. 29, 2007) (State of Oregon permitted to intervene in CWA suit to "protect its interests in developing and maintaining water-quality regulations in Oregon.") Finally, the EPA's interest in defending its own approval of Missouri's water quality standards is distinct from Missouri's interest here, because whereas the EPA has a broader responsibility of executing

7

the goals of the CWA in approving state water quality standards, the State of Missouri has a more focused interest in not only defending the work it invested in creating the standards but also in specific interests of Missouri in these particular standards. *See Mayo v. Jarvis*, No. CV 14-1751 (RC), 2014 WL 12804733, at *3 (D.D.C. Nov. 12, 2014) (finding the federal administrative agencies could not adequately represent the State of Wyoming in an action challenging a wildlife management plan created jointly by the agencies and the state, because the federal agencies represented the American people whereas Wyoming's interest was more narrow).

Therefore, the Court finds the State of Missouri is entitled to intervention as of right pursuant to Rule 24(a).

### b. The Associations' Motion to Intervene

#### i. Intervention as of Right

The Associations' motion to intervene, also filed within weeks after the action was filed, is timely. MCE does not argue otherwise. MCE and the Associations dispute the remaining requirements of intervention. The EPA takes no position on the Associations' intervention.

#### 1. Standing

An association "has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Red River Freethinkers v. City of Fargo*, 679 F.3d 1015, 1022 (8th Cir. 2012) (quoting *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996)).

The Associations argue that their members may be injured as a result of this lawsuit and thus have standing to sue in their own right, because MCE seeks "uniform, discrete toxicity levels for nutrients applicable to all Missouri lakes," Doc. 20-1, p. 6, and "nutrient standards other than those adopted by DNR would likely by financially disastrous for [Association of Missouri Cleanwater Agencies'] members that operate POTWs discharging to lakes, as such standards may well trigger unnecessary nutrient permit limits and costly facility upgrades." *Id*. at 14. The Association of Missouri Cleanwater Agencies' twenty POTW members hold National Pollution Discharge Elimination System (NPDES) permits in Missouri, which allow point sources to discharge pollutants within certain limits based on an assessment of each point source. *See* 40 C.F.R. § 122.44(d)(1). Regulated point sources include municipal storm sewers, animal feeding operations, industrial dischargers, and POTWs like the Associations' members. The Associations claim that when the Association of Missouri Cleanwater Agencies' members seek to renew their five-year NPDES permits, "[m]ember POTWs discharging to lakes predictably will be found to contribute to any nutrient levels above those specified numeric standards, which will trigger permit limits requiring costly upgrades." *Id*. at 10. Further, the Associations claim "science-based nutrient criteria subject to U.S. EPA approval in other states would be called into question were MCE [] successful in its bid to overturn U.S. EPA's approval of Missouri's nutrient screening approach." *Id*. at p. 14.

As an initial matter, the Associations misconstrue the relief that MCE seeks. MCE does not ask the Court to impose "uniform, discrete toxicity levels for nutrients applicable to all Missouri lakes," nor does MCE ask the Court to demand that Missouri adopt a single uniform, state-wide standard. MCE also does not ask the Court to declare that any use of a "screening approach" is categorically unlawful in all circumstances under the CWA. Rather, MCE asks the

9

Court to declare the EPA's approval of Missouri's standards to be arbitrary, capricious, an abuse of its discretion, and not in accordance with the CWA, to set aside this approval, and to order the EPA to disapprove of Missouri's nutrient standards. From there, Missouri would then be required to construct new water quality standards that are in compliance with the CWA and would be able to determine whether "uniform, discrete toxicity levels for nutrients applicable to all Missouri lakes" were appropriate.

MCE argues that even if it prevails here, given the many steps that will need to be taken and independent decisions made by the State of Missouri in designing the standards, EPA in approving the standards, and the State of Missouri in authorizing the Associations' members' Missouri NPDES permits, the alleged injury here is not sufficiently imminent or concrete so as to confer standing for intervention, citing the Eighth Circuit's decision in *United States v. Metropolitan St. Louis Sewer District,* 569 F.3d 829 (8th Cir. 2009). In *Metropolitan St. Louis Sewer District*, the Missouri Industrial Energy Consumers (MIEC), an association of businesses, moved to intervene in an enforcement action filed against the sewer district under the CWA. The underlying action alleged that the sewer district had violated its permits by discharging sewage into waterways, and it sought an injunction ordering the district to comply with the CWA. Because the MIEC represented several members that paid user fees to discharge into the sewer district's water system, it argued that these rates would increase if the sewer district was forced to bring its system into compliance.

The district court denied the MIEC's motion because it envisioned a sequence of events that could occur, but nevertheless were too speculative to create standing. *Id*. at 834 (discussing the district court's opinion). The Eighth Circuit affirmed. It "agree[d] with the district court that the possibility of increased sewer rates is not an imminent injury." *Id*. at 835. The Eighth

10

Circuit reached this conclusion by first noting that several of the contingencies asserted by the MIEC were conjectural and hypothetical; for example, the sewer district's charter imposed procedural hurdles it must surmount before increasing rates. Second, the Eighth Circuit observed that "any judgment or consent decree will likely establish what the [sewer district] must do to comply, rather than specify how the [district] will pay for the needed measures." *Id*. at 836. Stated otherwise, because the plaintiff's complaint did "not seek to compel the [district] to fund its compliance in any particular way," and "ma[de] no reference to MIEC's asserted economic concerns," the Eighth Circuit determined "MIEC has not adequately alleged that it will suffer a concrete and particularized injury." *Id*.

Similarly here, in order for the Associations' alleged threatened injury to occur, MCE must first prevail; the EPA must instruct Missouri on how it can comply with the CWA; Missouri must then, after an administrative process, choose "uniform, discrete toxicity levels for nutrients applicable to all Missouri lakes" that are "overly stringent"; Missouri must then decide to impose its restrictions on POTWs rather than focusing on industrial dischargers or other point sources; Missouri must then determine that the Associations' Missouri-based members discharge "at a level which will cause, have the reasonable potential to cause, or contribute to an excursion above any State water quality standard, including State narrative criteria for water quality," after "account[ing] for existing controls on point and nonpoint sources of pollution, the variability of the pollutant or pollutant parameter in the effluent, the sensitivity of the species to toxicity testing (when evaluating whole effluent toxicity), and where appropriate, the dilution of the effluent in the receiving water," 40 C.F.R. § 122.44(d)(1)(ii); and these effluent limits must then require capital expenditures in excess of the "millions or tens of millions of dollars" that the Associations' Missouri-based members are already spending on complying with the current

11

water quality standards. This is too many contingencies to present an imminently threatened injury. *See F.T.C. v. Johnson*, 800 F.3d 448, 451 (8th Cir. 2015) (finding consumer intervenors' alleged financial injury—that the FTC's suit against a seller of bitcoin mining machines would impair intervenors' contractual remedies in a separate pending lawsuit against the defendant for the same conduct—was not imminent as it was contingent on several conditions: "The FTC must first prevail, the district court must then award relief that precludes a consumer recovery, the consumers' class must be certified, and the class must prevail."); *Missouri Coal. for the Env't Found. v. Mccarthy*, No. 2:16-CV-04069-NKL, 2016 WL 3566253, at *4 (W.D. Mo. June 27, 2016) (rejecting the Association of Missouri Cleanwater Agencies' argument that a lawsuit seeking "an injunction directing the EPA's promulgation of revised or new lake numeric nutrient and chlorophyll water quality criteria that meet the requirements of the CWA within 90 days of the date of the order" would result in an imminent injury, because the alleged threated economic consequences would only occur after a series of contingent events that were too speculative to lead to an imminent injury).

According to the Associations, when a state's water quality standard contains a single-number effluent limit, the NPDES permit merely adopts a limitation on a point source's effluent discharge necessary to keep the concentration of a pollutant in a waterway at or below the numeric benchmark. But this assumes that Missouri will conclude the Associations' Missouri-based members have the reasonable potential to contribute to an excursion above the allowable nutrient concentrations such that an effluent limit is "necessary" to keep the nutrient levels in the relevant specific waterbody below such benchmark after accounting for other contributing factors. *See* 40 C.F.R. § 122.44(d)(1)(ii). In addition, before an NPDES permit is issued, the specifics of that permit are also subject to a public notice and comment period. *See* Mo. Code

12

Regs. tit. 10, § 20-6.020. Given the contingent and speculative nature of these possible events, the Court cannot say the Associations' Missouri-based members would face an imminent injury as a result of this lawsuit. *See Ctr. For Biological Diversity v. U.S. E.P.A.*, No. C13-1866JLR, 2014 WL 636829, at *5 (W.D. Wash. Feb. 18, 2014) (denying intervention as of right to a trade association representing members of the oil and natural gas industry in a suit seeking to compel the EPA to disapprove of Washington's list of impaired waters, because "[r]evision of members' permits, which will be determined not by this lawsuit but at the discretion of state and federal administrative agencies and via intervening regulatory processes, is too remote to merit intervention as of right."); *Ohio Valley Envtl. Coal., Inc. v. McCarthy*, 313 F.R.D. 10, 21 (S.D.W. Va. 2015) (denying intervention as of right to an association of coal producers in an action seeking to compel the EPA to develop TMDLs[2] for ionic toxicity, because "[the intervenors'] members' predicted permit changes will occur, if at all, not until after multiple interim steps have been taken by federal and state administrative agencies" and therefore "a judgment for Plaintiffs would not necessarily affect [intervenors'] members' NPDES permits.")

The threatened injury is even more speculative and less imminent for the Associations that do not have members holding NPDES permits issued by Missouri. Six of the eight proposed intervenors are state associations from Ohio, California, North Carolina, South Carolina, Virginia, and West Virginia, and 310 of the 321 National Association of Clean Water Agencies' POTW members are located outside Missouri. The Associations claim that these non-Missouri

---

[2] As discussed above, when a waterbody is classified as "impaired," certain additional procedures and protections are triggered under the CWA. This includes establishing a total maximum daily load (TMDL) for certain pollutants in a particular waterbody, which calculates the impaired water's "loading capacity"—the greatest amount of a pollutant that can be introduced without violating water quality standards. 40 C.F.R. §§ 130.2(e)-(i), 130.7(c). These are then incorporated into any NPDES permits for entities seeking to discharge into that impaired water.

13

entities face an imminent injury, because the Court's ruling here "would call into question the legality of standards utilizing a screening approach and infringe on states' unique CWA section 303 responsibilities," thereby having a "chilling effect on the promulgation of similar approaches in other states and on EPA's approval of such approaches." Doc. 25, p. 6. However, as discussed, MCE's Complaint does not take the position that any combined criteria approach such as Missouri's is categorically unlawful under the CWA. The vague possibility that setting aside the EPA's approval of Missouri's nutrient standards may cause the EPA to disapprove of other nutrient standards within the specific context of those states' approval processes, which in turn could lead to an effluent nutrient limit requirement in the Associations' members' NPDES permits that would exceed the members' nutrient removal capabilities and require them to make costly removal upgrades, is speculative at best. The Associations' allegation that the Court's decision "could impact" the EPA's review of other states' water quality standards and subsequent effluent limitations imposed in accordance with those standards does not present an imminent injury. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 133 S. Ct. 1138, 1147, 185 L. Ed. 2d 264 (2013) ("[W]e have repeatedly reiterated that threatened injury must be certainly impending to constitute injury in fact, and that allegations of *possible* future injury are not sufficient." (internal quotations and alterations omitted) (emphasis in *Clapper*)).

The authority that the Associations cite to in support of their claim for standing is distinguishable. In *National Parks Conservation Association*, six environmental groups sued the EPA, seeking an order directing the EPA to issue RAVI BART ("reasonably attributable visibility impairment best available retrofit technology") for a power plant in Sherburne County, Minnesota that was owned by Northern States Power Company. The plaintiffs' complaint charged the EPA with a "non-discretionary duty . . . to promulgate modern pollution control

14

limits . . . for [the Sherburne County power plant]." *Nat'l Parks Conservation Ass'n*, 759 F.3d at 972. Northern States Power Company moved to intervene, arguing that the plaintiffs' desired remedy would impose costly pollution controls on its power plant, thus constituting an imminent risk of financial harm. The Eighth Circuit found that the intervenors could establish standing. Northern States had alleged a concrete and particularized injury, the Eight Circuit determined, because if the plaintiffs were granted the relief they sought—control limits that would cost over $280 million to implement—Northern States, the company that owned the power plant, "would unavoidably be harmed economically." *Id*. at 975. Accordingly, the Eighth Circuit differentiated the case from *Metropolitan Sewer District*, where "the potential intervenor's financial injury was contingent on several conditions." *Id*.

The Associations' injury here is also contingent on several conditions and therefore more closely analogous to *Metropolitan Sewer District*. As discussed above, in order for the Associations to be harmed by the suit, Missouri would need to create and approve new water quality standards through its administrative process, these new standards would need to result in the single numeric standard applicable to all Missouri lakes as the Associations fear, which must be followed by a determination that the nutrient discharge the Associations' Missouri members produce has the reasonable potential to contribute to an exceedance of that criterion in a particular lake in light of all the regulatory factors, which must then result in costly upgrades in addition to the upgrades required under the current regulations. This outcome thus relies on numerous contingencies that could follow from, but would not be dictated by, the disposition of the present case. Furthermore, in *National Parks*, the Plaintiff sought a particular remedy directed at the intervenor's power plant. Here, however, MCE has not sought a particular

remedy directed at any of the Associations' members, nor has it asked for the Court to impose the uniform, discrete toxicity levels for nutrients that the Associations fear.

The Associations also cite *South Dakota v. Ubbelohde*, where the Eighth Circuit reviewed a motion to intervene in an action by South Dakota against the Army Corps of Engineers seeking an injunction against the defendant's release of water from an upstream reservoir in South Dakota, because it could impair the fisheries in South Dakota's reservoir. *S. Dakota*, 330 F.3d at 1024. South Dakota sought both a preliminary injunction requiring defendant to maintain water levels at the South Dakota reservoirs as well as injunctive relief requiring the Defendant "to prevent irreparable harm to the fisheries of the mainstream reservoirs, when the harm is [inflicted] to benefit downstream navigation." *Id*. The intervenors were a group of entities that depended on the levels of the downstream river and feared that the Court's ruling would lead to a decreased waterflow downstream. *Id*. The Eighth Circuit found that given South Dakota's requested relief, the Defendant "may be forced to reduce downstream flows in drought conditions to maintain the water levels at all of the reservoirs," and therefore the plaintiffs had presented sufficient evidence of a threatened injury. *Id*.

In *Metropolitan St. Louis Sewer District*, the Eighth Circuit distinguished the facts of *Ubbelohde*, because "*Ubbelohde* concerned a single, nonfungible resource—if water were retained in the reservoir, it could not be available for downstream use. In contrast, if plaintiffs were to prevail in this case MIEC would not unavoidably be harmed economically because the District may use alternate means to pay for its compliance." *Metro. St. Louis Sewer Dist.*, 569 F.3d at 836. Similarly here, if MCE prevails and the Court sets aside the EPA's approval of Missouri's water quality standards, Missouri will still have leeway in how it chooses to structure its nutrient criteria, what levels those criteria are set at, and whether it focuses more stringent

NPDES restrictions on industrial dischargers such that any levels from the Associations'

members will not have the reasonable potential to contribute to an exceedance of the standards.

To be sure, MCE contends in its Complaint that the "EPA arbitrarily and capriciously approved

the Missouri standards after EPA had previously informed Missouri that the evidence before it

indicated that numeric criteria for nutrients were necessary. Although EPA discussed no new

evidence indicating that numeric criteria for nutrients were not necessary and viable, EPA

accepted Missouri's contention that MDNR could not produce numeric nutrients criteria at this

time." Doc. 1, p. 2. However, even if as a result of this lawsuit the EPA instructs the State of

Missouri that it has failed to demonstrate that numeric criteria were not necessary and viable, the

State of Missouri will have discretion in, for example, determining whether to structure such

criteria based on localized eco-regions so as to avoid the "uniform, discrete toxicity levels for

nutrients applicable to all affected Missouri lakes" that the Associations fear, as well as what

levels to set these numeric criteria to satisfy the requirements of the CWA.

  The Associations also cite to *American Farm Bureau Federation v. U.S. E.P.A.*, 792 F.3d

281, 293 (3d Cir. 2015) to argue that the injury here is certainly impending. In *American Farm

Bureau*, Plaintiff trade associations challenged the EPA's promulgation of a total maximum daily

load (TMDL). The Third Circuit found that the trade associations had standing to challenge the

TMDL, because even though the TMDL would still need to be incorporated into state

enforcement procedures, once incorporated the TMDL would impose more stringent

requirements on the plaintiffs and cause costly upgrades. *Id*. *American Farm Bureau* is similar

to *City of Kennett v. EPA*, where the Eighth Circuit found a Missouri city had standing to

challenge the EPA's promulgation of a TMDL wasteload allocation for pollutants from the

City's wastewater treatment plant, which were more stringent than the then-current wasteload

allocations under the City's NPDES permit. *City of Kennett, Missouri v. Envtl. Prot. Agency*, 887 F.3d 424, 429 (8th Cir. 2018). For example, although the city's then-current NPDES permit included limits of "65 mg/L of biochemical oxygen demand and 110 mg/L of total suspended solids . . . [t]he TMDL sets wasteload allocations for these two pollutants at 5 mg/L and 31 mg/L, respectively." *Id*. Although the EPA argued the injury was not certainly impending because the TMDL had not yet been incorporated into the Plaintiff's permits, the Eighth Circuit found that the injury was nonetheless certainly impending, because "the EPA here has approved a TMDL that requires more stringent limits for the City" and "[t]he City is challenging that TMDL." *Id*. at 431. It was clear that the Plaintiff's future permit would need to comply with the more stringent TMDL, because "[o]nce approved by the EPA, the TMDL's wasteload allocations are binding on future permits unless the EPA approves a replacement TMDL." *Id*.

*American Farm Bureau* and *City of Kennett* are distinguishable. In those cases, the threatened injury was a TMDL that had already been promulgated and would imminently impose added requirements and costs on the trade association' members and the City of Kennett. Here, however, if MCE prevails, the substance of the nutrient criteria will be determined by the State of Missouri through another administrative process, and therefore what limits it will potentially impose on the approximately thirty Missouri-based Associations' members, and whether and to what extent these limits will cause any economic injury on these members beyond that being imposed by the current standards is unclear.

The Associations express concern that if the Court were to deny them intervention here because the injury is not yet imminent, they may never have an opportunity to protect their interests in their NPDES permits, citing to a Maryland state case wherein the Maryland court stated that an environmental organization had belatedly raised an argument regarding Maryland's

18

TMDL implementation plan in a suit seeking to challenge Maryland's provision of NPDES permits in compliance with that TMDL implementation plan. *See Maryland Dep't of Env't v. Anacostia Riverkeeper*, 447 Md. 88, 129 n. 46, 134 A.3d 892, 916 (2016). The Maryland court stated that the plaintiffs should have raised this argument in the previous litigation that challenged this particular TMDL that led to Maryland's implementation plan. The Court takes no position on whether the Associations would be prevented from challenging state regulations that led to a permit effluent limitation in a suit challenging the permit limitation itself. Regardless, the Maryland court's conclusion further supports the Court's position here. If MCE prevails here and Missouri develops nutrient criteria that the Associations fear are excessive and unlawful, they may choose to challenge it then. At that point, the Associations' injury would likely be imminent, because Missouri would have created and the EPA would have approved the criteria that the Associations predict would directly cause the Associations' alleged injury.

The Court's conclusion here is supported by pragmatic consideration as well. If the Court were to allow the Associations to intervene here, not only would every POTW, every privately owned treatment facility, and every industrial discharger in the state of Missouri that *may* be impacted by any future water quality standards have the potential to claim a right to intervention,[3] but so too would any wastewater discharger in the United States that discharges

---

[3] The Associations do not specify how many other wastewater treatment plants in Missouri similarly require permitting. In the Missouri Department of Natural Resources Regulatory Impact Report cited by the Associations, which assessed the possible impact of the proposed nutrient criteria for lakes, the report states that "[t]here are more than 3,000 facilities with Missouri State Operating Permits producing a nutrient load from wastewater that are located within the watersheds of lakes and reservoirs assigned designated uses in the Missouri Use Designation Dataset" and "there are 233 publicly owned treatment works (POTW) and 814 privately owned facilities that may be affected by the rule." *See* Missouri Department of Natural Resources, *Draft Regulatory Impact Report for 10 CSR 20-7.031 Water Quality Standards*, pp. 12–13. https://dnr.mo.gov/env/wpp/rules/docs/draft-wqs-rir-9-25-17.pdf

19

water into a waterbody subject to a state's water quality standards requiring the EPA's approval under the CWA. This is contrary to promoting judicial efficiency, one of the primary purposes of permitting intervention. *See Ctr. for Biological Diversity*, 2009 WL 10727789 at *3 (finding a group of four intervenors lacked a protectable interest in a suit regarding discharge into Washington coastal waters where three of the four intervenors did "not hold permits to discharge into the water body that is the subject of this action" but rather discharged to tributary waters, and "[i]f the Court were to allow intervention by every permit-holder who could discharge into one of Washington's rivers that eventually flows into the sea, this suit would balloon out of control.")

Therefore, the Associations have not identified an imminent injury to support Article III standing in this lawsuit.

## 2. 24(a)(2)

However, even if the Court were to find the Associations had standing, they could not satisfy all of the Rule 24(a)(2) requirements, because in light of the Court's grant of the State of Missouri's motion to intervene, the Associations' interests are adequately represented by the existing parties.

A party is "not entitled to intervene in the litigation if their interests are adequately represented by existing parties." *Mille Lacs Band of Chippewa Indians v. State of Minn.*, 989 F.2d 994, 999 (8th Cir. 1993). Although typically the burden of showing inadequate representation is "minimal," the burden of demonstrating inadequate representation may be higher where a state is also a party to that suit. *Id.* at 1000. "Under the *parens patriae* concept . . . a state that is a party to a suit involving a matter of sovereign interest is presumed to represent the interests of all its citizens. Thus, to intervene in a suit in district court in which a state is

20

already a party, a citizen or subdivision of that state must overcome this presumption of adequate representation." *Id.* at 1000 (quoting *Environmental Defense Fund, Inc. v. Higginson*, 631 F.2d 740 (D.C. Cir. 1979) (per curiam)).

The State of Missouri has stated its clear intent to not only defend its interest in the nutrient standards as drafted and their ongoing implementation but also to defend "the health and well-being—both physical and economic[—]of Missouri's citizens." Doc. 17, p. 7. Indeed, it has affirmatively sought intervention in this litigation precisely to defend those interests should the EPA's interests diverge. The Court finds that the Associations share Missouri's interest in ensuring the regulatory scheme here is responsive to the economic concerns, and therefore the *parens patriae* presumption applies. The State of Missouri's interests fairly encompass the Associations' interests such that they will be adequately represented here.

The Associations assert that the "EPA and DNR do not, and indeed cannot, represent local government members' interests in this matter" because they have a "much 'more narrow and parochial financial interest' in ensuring reasonable water quality standards grounded in sound science." Doc. 25, p. 9 (quoting *National Parks Conservation Association*, 759 F.3d at 977). However in *National Parks Conservation Association*, the Eighth Circuit distinguished the interests of the EPA and the targeted power-plant operator, because while the EPA had a much broader authority under the Clean Air Act, the intervenor's interest was "more than mere procedural formality," and as the owner of the power plant targeted by the plaintiff, was "seeking to protect a more narrow and parochial financial interest not shared by the general public." *National Parks Conservation Association*, 759 F.3d at 977 (internal quotation and alteration omitted). The interests shared by the Associations here are not so narrow and more closely parallel the State's assertion of its interests in both the physical and economic well-being of

21

Missourians. As the Associations describe, the Associations "have a duty to protect the environment and public health through compliance with many applicable state and federal regulations while also ensuring local ratepayer dollars are spent effectively." Doc. 25, p. 2. This is sufficiently represented by the State of Missouri's stated interest of protecting the physical and economic well-being of Missourians.

In *Curry v. Regents of University of Minnesota*, the Eighth Circuit considered a motion to intervene in an action brought by a group of University of Minnesota's students challenging the University's funding of student groups with particular ideological views. Those particular student groups sought to intervene seeking to protect their "free speech and association as well as their related right to undiminished funding." *Curry*, 167 F.3d at 421. The Eighth Circuit found that the student groups had failed to meet their "minimal burden of showing that the University will inadequately represent their interests," because,

> [t]he Movants characterize their interest as a concern that they will lose funding, which in turn may lessen their expressive activities, while characterizing the University as merely interested in upholding the current fee system. The Movants potentially may lose funding, however, only if the fee system is not upheld. Thus, although the Movants' motives may be distinguishable from the University's, the Movants' and the University's interests are the same: both want the current fee system upheld.

*Id.* at 423. Here, the State of Missouri has asserted an interest not only in upholding its current water quality standards but also in protecting the economic interests of Missourians, as have the Associations. In *Curry*, the Eighth Circuit further held that its conclusion was bolstered by the doctrine of *parens patriae*, because "[a]lthough the Movants assert that the University does not share their speech and economic interests, the University's interest in defending the mandatory student fee system that has been created to support student organizations encompasses the Movants' asserted interests." *Id.* Similarly here, even the Associations assert that the State of

22

Missouri adopted these particular water quality standards and avoided a "broad brush and overly stringent approach" in recognition of the higher compliance costs that other approaches may impose. Doc. 20-1, pp. 11–12; Doc. 25, p. 1 (describing how Missouri crafted its nutrient criteria to "protect against the environmental risk of beneficial use impacts while minimizing the economic risk of forcing treatment plant upgrades where they are not needed to protect water quality.") This, in addition to Missouri's stated intent to protect economic interests, indicates that Missouri's interests in this litigation "encompass[] the [Associations'] asserted interests." *Curry*, 167 F.3d at 423. *See also Standard Heating & Air Conditioning Co.*, 137 F.3d at 572 (finding that although trade associations claimed they would incur "increased costs from injuries on job sites [that are] different from the costs to the general public," "[t]hese potential costs are insufficient to overcome presumption that the city adequately represents the appellants' interests . . . because costs arising from on the job injury are the type of costs the government seeks to reduce with its regulatory system.")

Moreover, even if the Associations' members' costs in Missouri are different from the costs imposed on the general Missouri population, "these increased costs to the associations present no possibility of divergence between their position and that of [Missouri] because both take the same position in the litigation." *Standard Heating & Air Conditioning Co.*, 137 F.3d at 572 (internal quotations and alterations omitted) (finding trade associations' interests were adequately represented by the City defendant where the potential costs incurred by trade associations due to on-the-job injuries did not present any possibility of divergence in litigation). *See also Envtl. Def. Fund, Inc. v. Higginson*, 631 F.2d 738, 740 (D.C. Cir. 1979) (finding the State of Colorado would adequately represent the interests of local water districts; although the water districts "may indeed have a more direct economic interest in the operation of the water

23

projects in issue than does the state," there appeared to be "no possible divergence between their position and the state's position on the primary issue. All oppose the claim that a comprehensive environmental impact statement is required by law. The arguments of the water districts would be merely cumulative.") Aside from asserting that the Associations' and Missouri's interests stem from differently scaled motivations, the Associations have failed to explain how their interests may diverge such that they would be inadequately represented in this action.

Therefore, the Associations' motion to intervene as of right pursuant to Rule 24(a) is denied.

### ii. Permissive Intervention

Federal Rule of Civil Procedure 24(b) provides that: "[o]n timely motion, the court may permit anyone to intervene who has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24. The Eighth Circuit has emphasized that "[t]he decision to grant or deny a motion for permissive intervention is wholly discretionary." *S. Dakota ex rel Barnett v. U.S. Dep't of Interior*, 317 F.3d 783, 787 (8th Cir. 2003). "The principal consideration in ruling on a Rule 24(b) motion is whether the proposed intervention would unduly delay or prejudice the adjudication of the parties' rights." *Id*.

The Court finds that the Associations have failed to present a persuasive reason for the Court to exercise its discretion and allow permissive intervention. Whatever interest they may have in the eventual nutrient standards that would be adopted if the Court were to set aside the EPA's approval of the current standards here, their interests are remote from the substance of the litigation here and their involvement risks introducing undue delay.

Although the Associations contend that they can bring technical expertise to bear on the proceedings, the Court is not convinced that this expertise is directly relevant here or is not

already sufficiently accounted for by the State of Missouri and the EPA.  For example, the Associations state that "[t]he members' technical expertise in executing NPDES permit requirements allows them to provide input on standards implementation, NPDES permit compliance, and funding which is distinct from DNR's and EPA's perspective as regulators." Doc. 20-1, p. 2.  But implementation mechanisms and NPDES permit compliance are not the focus of this litigation; rather, the central question here is whether the EPA acted in accordance with the CWA and APA in approving Missouri's water quality standards.  Moreover, the State of Missouri administers the state's NPDES program and therefore likely will be able to provide the needed technical expertise should such questions arise.  The Associations also claim that they "will explain to the Court why these standards are proper and effective, and why site-specific expertise brought to bear by the states is critical to their development and implementation."  Doc. 20-1, p. 7.  However, this expertise will likely be more fully and directly advanced by the State of Missouri, the creator and principal advocate of its own standards.  To the extent that their perspective is valuable as the litigation proceeds, the Associations may seek to participate as amicus curiae.  *See Pettet v. May*, No. 2:11-CV-04049-NKL, 2011 WL 3354089, at *4 (W.D. Mo. Aug. 3, 2011) (quoting *Liberty Res., Inc. v. Philadelphia Hous. Auth.*, 395 F.Supp.2d 206, 209 (E.D. Pa. 2005)) ("Although a party fails to meet the standard for intervention under Rule 24, a court may nonetheless allow a party to participate in litigation as an amicus curiae where 'although short of a right to intervene, the amicus has a special interest that justifies his having a say.'")

The Court's concerns of undue delay are magnified when considering the Associations whose membership consists of non-Missouri POTWs.  The Associations have over 670 local agency members combined, yet only approximately thirty of these members are in Missouri.  Six

of the eight Associations advocate for the interests of members located wholly outside of Missouri. Their involvement is more likely to delay and sidetrack this suit. *See N. Dakota ex rel. Stenehjem v. United States*, 787 F.3d 918, 923 (8th Cir. 2015) (affirming the district court's denial of a Rule 24(b) motion in part because the proposed intervenors would inject unrelated issues into the case, thus causing undue delay); *Metro. St. Louis Sewer Dist.*, 569 F.3d at 840–41 ("Not only would allowing [intervenor business associations] to intervene produce no gains in judicial efficiency, it would most likely complicate and delay the proceedings with peripheral issues of cost and local government financing.")

Therefore, the Court in its discretion declines the Associations' request to intervene under Rule 24(b).

## IV.  CONCLUSION

For the reasons stated above, the State of Missouri's motion to intervene is granted. The Associations' motion to intervene is denied.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  May 11, 2020
Jefferson City, Missouri